UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

FEDNAT HOLDING COMPANY, *et al.*,[1]          Case No.: 22-19451-PDR
                                                         (Jointly Administered)

      Debtors.

_____/

MONARCH NATIONAL INSURANCE
COMPANY and HP MANAGING AGENCY, LLC,

      Plaintiffs,

v.

FEDNAT UNDERWRITERS, INC.,                    Adv. Pro. No.

      Defendant.

_____/

## MONARCH NATIONAL INSURANCE COMPANY AND HP MANAGING AGENCY, LLC'S ADVERSARY COMPLAINT

Plaintiffs, Monarch National Insurance Company ("Monarch") and HP Managing Agency,

LLC ("HPMA") (collectively, "Plaintiffs") by and through undersigned counsel, hereby file this

Adversary Complaint against Debtor FedNat Underwriters, Inc. ("FNU") and allege the following

in support of the requested relief:

---

[1] The Debtors in these Chapter 11 Cases are FedNat Holding Company ("FNHC"); FedNat Underwriters, Inc. ("FNU"); ClaimCor, LLC ("ClaimCor"); Century Risk Insurance Services, Inc. ("CRIS"); and Insure-Link, Inc. The Debtors' headquarters are located at 14050 N.W. 14th Street, Suite 180, Sunrise, Florida.

## NATURE OF THIS ACTION

1.     Monarch is licensed to write homeowners property and casualty insurance in Florida.  FNU previously served as Monarch's managing general agent.  HPMA is Monarch's current managing general agent.  Monarch's policy and claims data is currently housed within technology systems and platforms that FNU currently controls (the "Systems").[2]  Access to the Systems is required for HPMA to process Monarch policyholder claims and is thus critical for Monarch to conduct its business.  Under its own contract, HPMA is diligently working with one of the Systems' providers, Tierpoint, LLC ("Tierpoint")[3], to create a new fully functioning system to house the critical Monarch policyholder data and plug into third-party software licenses that will allow HPMA to service Monarch's insurance policies (the "Policies") without the use of the Systems.

2.     On four separate occasions and as recently as February 22, 2023, FNU, in violation of applicable agreements and duties, has held Monarch/HPMA hostage by: (i) threatening to terminate and actually terminating certain managing general agent services owed by FNU to Monarch that are necessary for Monarch to conduct business; (ii) threatening to terminate HPMA and Monarch's Systems access to policy and claims data; and (iii) actually terminating the administrative control access to the Systems of HPMA's systems administrator, without warning—all for the purpose of extracting large payments from HPMA and Monarch as ransom.

3.     FNU's most recent ransom demand on February 22, 2023 included abruptly shutting off HPMA's administrative access to the Systems (breaching an express contractual obligation not to do so undertaken less than two months earlier) and threatening to terminate all of

_____

[2] Monarch owns its policy and claims data.

[3] Tierpoint provides and maintains the servers on which FNU hosts its data and on which Monarch's data is hosted as well as data for FNHC's insurance carrier and largest subsidiary, FedNat Insurance Company ("FNIC").

HPMA's (and thus Monarch's) access to the Systems if Monarch and HPMA did not pay over $3 million in supposed "unpaid balances" in less than 48 hours. Monarch disputed such amounts on several grounds, including that they were subject to rights of offset on account of claims owed by FNU to Monarch as described more fully below. Under protest, and notwithstanding FNU's historical pattern of inflated and admittedly erroneous invoicing practices, Monarch wired over $2.4 million to FNU and HPMA wired another approximately $450,000 to Tierpoint within the time frame FNU arbitrarily demanded to prevent immediate and irreparable harm to Monarch's business and its more than 60,000 policyholders.

4.      Notably, FNU's initial ransom demand of over $3 million inexplicably dropped to $2.8 million over the course of two days, demonstrating FNU's haphazard and inaccurate invoicing practices.

5.      In response, HPMA pointed out that $150,000 of the ransom demand was a duplicative Tierpoint January charge and further provided back-up data illustrating FNU's invoice backdating of over $800,000 in violation of prior agreements. Less than two hours later, FNU agreed to reinstate HPMA's administrative access by the end of the day (which it failed to do until three days later) and withdrew its looming threat to cut off all Systems access.

6.      FNU is well aware that if HPMA's access to the Systems is terminated, Monarch will suffer immediate irreparable harm because HPMA will not be able to access or service any of the claims on Monarch's Policies or renew existing Policies. If FNU deprives HPMA access to the Systems, the impact on Monarch's financial and business viability will be calamitous due to statutory requirements for continuous service to policyholders. Furthermore, such termination of access to the Systems could be devastating to the ***over sixty thousand*** Monarch policyholders in Florida and their families, whose claims will not be timely serviced or processed.

7.      FNU's pattern of behavior illustrates its and its representatives' malfeasance and mismanagement, particularly given that Debtor FedNat Holding Company ("FNHC") currently owns a 30% interest in Monarch.  Thus, FNU's continuing acts of bad faith are increasing claims against FNU (reducing any value of FNU available to FNHC as the sole owner of FNU) and also damaging one of FNHC's largest remaining assets (the 30% interest in Monarch) and are in direct breach of the parties' agreements.

8.      Conspicuously and not coincidentally, FNU's latest hostage demand and cutoff of HPMA's administrator's access occurred **_the day after_** Monarch filed a Proof of Claim ("POC") in this Court seeking over $1.625 million from FNU based on FNU's breaches of various contractual agreements and fiduciary duties, among other claims, along with substantial set-off and indemnification rights.[4]

9.      As further detailed below, FNU has repeatedly breached its contractual obligations that it owes to Monarch and HPMA, and has acted in bad faith and in violation of its duty of good faith and fair dealing.  Among other types of relief, Plaintiffs seek injunctive relief to bar FNU from cutting off administrator access or otherwise denying Plaintiffs' access to the data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies. Plaintiffs also seek injunctive relief (1) prohibiting FNU from denying Plaintiffs' access to the data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies; (2) prohibiting Defendant from cutting off administrative access to the Systems; and (3) restoring the status quo of Plaintiffs' set-off rights by requiring FNU to either return the $2,414,891.04 ransom payment to Monarch or pay into the Court the $2,414,891.04 pending the outcome of Monarch's POC.

---

[4] *See* Monarch POC, Claim No. 211, filed February 21, 2023.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

11.    Venue is proper under 28 U.S.C. § 1409(a).  This adversary proceeding is related to the Chapter 11 Cases, which are pending in this Court.

12.    This adversary proceeding is commenced pursuant to:

(a)    Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which allows for a proceeding "to recover money or property";

(b)    Rule 7001(2) of the Bankruptcy Rules, which allows for a proceeding "to determine the validity, priority, or extent of a lien or other interest in property";

(c)    Rule 7001(7) of the Bankruptcy Rules, which allows for a proceeding to "obtain an injunction or other equitable relief";

(d)    11 U.S.C § 105(a), which allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" title 11 of the United States Code (the "Bankruptcy Code").

13.    Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs consent to the entry of a final judgment or order with respect to this Complaint if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## PARTIES

14.    Plaintiff Monarch was formed in 2015 and is a Florida company with its principal place of business in Sunrise, Florida.  Monarch is licensed to write homeowners property and casualty insurance in Florida.  In February 2018, Monarch became a wholly owned subsidiary of FNHC.  In the summer of 2022, in a series of two transactions, a group of funds managed by Hale

Partnership Capital Management, LLC (the "Hale Investors") became the 70% shareholders of Monarch's common stock. FNHC owns the remaining 30% of Monarch's common stock.

15.     Plaintiff HPMA was formed in November 2022 and is a limited liability company with its principal place of business in Tallahassee, Florida. HPMA currently serves as the managing general agent for Monarch.

16.     Defendant FNU is a Florida corporation and a wholly owned subsidiary of FNHC with its principal place of business in Sunrise, Florida. FNU previously served as the managing general agent for Monarch.

## FACTS

### A.  The MGAA

17.     FNU began serving as the managing general agent for Monarch's Policies in 2015, providing managing general agent services including but not limited to underwriting, accounting, marketing, actuarial, and claims management.

18.     In 2018, Monarch and FNU entered into an Amended and Restated Managing General Agency and Claims Administration Agreement (the "MGAA").[5]

19.     The MGAA had a three-year term that would renew automatically but could be terminated by either party with or without cause. The MGAA "shall terminate" 60 days after the delivery of written notice to terminate "at the election of [Monarch] for any reason." MGAA §§ 1.5, 8.2(e).

---

[5] The relevant contracts and correspondence referenced herein are being filed in this Court contemporaneously in connection with *Monarch National Insurance Company and HP Managing Agency, LLC's Expedited Motion for Injunctive Relief to Enjoin Debtor FedNat Underwriters, Inc. from Terminating Access to Systems Required to Service Monarch's Policyholders*.
*(continued on next page)*

20.     In the event of termination, the MGAA provided a "run-off" provision whereby Monarch could elect to "have [FNU] service the Policies" or Monarch could "manage the run-off itself."  MGAA § 8.6(a).[6]

21.     The MGAA also stated that in the event of termination, FNU "shall immediately provide [Monarch] with a tape back-up of all programs and data libraries, including updated source code and data files, used in the production and administration of business hereunder."  MGAA § 8.6(c).  Furthermore, under the MGAA, FNU granted "at no cost to [Monarch], a limited license for [Monarch] to use [FNU's] software in connection with the administration and run-off of the business produced under the MGAA."  FNU was obligated to "deliver the software, together with the source and object code for the software" immediately to Monarch.  MGAA § 8.6(d).

**B.  Hale Investors Acquire Controlling Interest in Monarch**

22.     Following a series of precipitous and severe financial declines, in April 2022, FNHC's main insurance carrier and largest subsidiary, FedNat Insurance Company ("FNIC"), was downgraded by financial rating firm Demotech from an "A" (exceptional) to "S" (substantial), making it impossible for FNIC to procure reinsurance and remaining a going concern.[7]  Shortly thereafter, Florida's Office of Insurance Regulation ("OIR") mandated a full restructuring plan in seven days from FNIC.

23.     During a time of extreme financial distress after seventeen months of evaluating strategic alternatives with its advisors, FNHC sought assistance from its largest shareholder, the

---

[6] Pursuant to Section 8.6(a) of the MGAA, "the term 'run-off' shall mean confirming coverage under the Polices to claims adjusters, administering the in-force Policies and any required renewals and endorsement thereof, providing reports to the Company as elsewhere required by this Agreement, paying premium to the Company and return premium to the insureds, collecting all sums due from Agents, including return commissions, and such other activities of MGA specifically required by this Agreement."

[7] Reinsurers and many mortgage lenders will not accept less than an exceptional rating.  An "S" rating is not recognized as acceptable by Fannie Mae and Freddie Mac, the government-sponsored purchasers of mortgages.

*(continued on next page)*

Hale Investors.[8]  Namely, the Hale Investors were asked directly by the FNHC Board of Directors (the "Board") to submit a proposal for a restructuring plan to comply with Florida OIR's requirements and timeline.  By the end of April 2022, a term sheet was executed whereby the Hale Investors would invest $15,000,000 into Monarch—which was at the time a wholly-owned subsidiary of FNIC.

24.    Following approval by the Board, Florida OIR, and consent from FNHC's bondholders, in the summer of 2022, in a series of two transactions, the Hale Investors became the 70% shareholders of Monarch's common stock (the "Monarch Investment"), effectively enabling FNHC to avoid liquidation and continue operations and protecting the significant investment the Hale Investors had made in FNHC common stock.[9]

25.    Insurance companies in Florida are required to operate with a managing general agent.  Thus, despite the change of control, the MGAA between FNU (which remained a wholly owned subsidiary of FNHC) and Monarch remained in full force and effect subject to some changes agreed to in the Monarch Investment, which were reflected in a matrix attached to the Cost Reimbursement Agreement (the "CRA").

### C. Monarch's Notice of Default and Funding of Payroll (First Ransom Demand)

26.    In September 2022, FNIC's attempt at a solvent run-off after its merger with Maison Insurance Company ("Maison") in August 2022 had failed, and FNU/FNHC were unable to pay its own employees, including those who were providing services for the benefit of Monarch under the MGAA.[10]  As such, to avoid the irreparable harm of FNU/FNHC losing employees

---

[8] The number of shares of FNHC held by the Hale Investors, collectively, was the largest holding of shares in FNHC.
[9] Forty percent (40%) of the Monarch common shares were purchased by FNHC in the same transaction, but ten percent (10%) was thereafter transferred by FNHC to the Hale Investors via a put option contract in place, leaving FNHC with a thirty percent (30%) stake in Monarch.
[10] On September 27, 2022, FNIC was placed in receivership by the Florida Department of Financial Services.

essential to performance of services under the MGAA, Monarch was forced to make its first ransom payment and funded FNU/FNHC's mid-September payroll in the amount of $681,025.98 to prevent loss of service, minimize the disruption to Monarch's business, and mitigate its damages from FNU's failure to perform.

27.     As a result of FNU/FNHC's inability to fund payroll, FNU was unable to provide the services required of it under the MGAA.  As such, Monarch provided written Notice of Default and Violation of the MGAA to FNU.  Among other breaches, Monarch asserted that FNU "failed to provide adequate staffing to timely provide the agreed upon services."

**D.  FNU Abruptly Refuses to Provide Certain Services to Monarch**

28.     In October 2022, FNHC hired GGG Partners, LLC ("GGG") to serve as its restructuring advisor.  Shortly after GGG was hired, FNU abruptly took the position that many of the services FNU had historically provided to Monarch since its inception and had been providing to Monarch under the MGAA were somehow no longer contractual obligations of FNU.

29.     As further explained in Monarch's POC, FNU, consistent with its contractual obligations, had historically provided a suite of services including but not limited to underwriting, accounting, and marketing services to Monarch.  Now, during its obvious time of financial distress, FNU suddenly took the position that it was not required to provide such services, despite the plain language in the parties' contractual agreements to the contrary.  As a result, Monarch, in order to remain in business, was forced to retain and pay third parties and hire a new managing general agent (HPMA), which had to retain and pay new employees, to provide such services.[11]

---

[11] *See* Monarch POC, Claim No. 211, filed February 21, 2023.
*(continued on next page)*

30.     Similarly, FNU ceased paying one of its long-time subcontractors that had been performing actuarial services that FNU was required to provide under the MGAA.  As a result, Monarch was forced to make these payments to avoid having the actuarial services cut off.[12]

31.     Furthermore, FNU failed to retain sufficient staff and failed to manage their staff and independent contractors to adjust claims on Monarch's Policies, as required under the MGAA. Indeed, there was such a steep underperformance in the number of Monarch claims adjusted in October 2022 after Hurricane Ian that Monarch was forced to hire a third party to perform claims adjusting services in October and November 2022.  Adding insult to injury, after these bankruptcy proceedings were filed in early December 2022, almost all of FNU's claims adjusters (both employed adjusters and independent contractors) either went on vacation or were otherwise simply not performing their duties, in dereliction of FNU's contractual obligations owed to Monarch. FNU's failure to adequately adjust claims has resulted in an increase in the number of Department of Financial Services ("DFS") complaints, lawsuits, and instances where claims were allegedly mishandled.[13]

### E.  Monarch Terminates The MGAA

32.     On November 1, 2022, and based on FNU's failure to cure its breaches, poor performance, and its open rejection of its contractual obligations, Monarch sent a Notification of Termination of the MGAA to FNU.  In its Notice of Termination, Monarch informed FNU that Monarch "intends for [FNU] to service the Policies through the sixty (60) day run-off period and to transition all necessary functions promptly pursuant to the terms of the MGA[A]."

33.     In its Notice of Termination, Monarch specifically stated that FNU must honor its obligations in the MGAA to: (i) provide Monarch with FNU's records regarding Monarch's

---

[12] *Id.*
[13] *Id.*

business, including all claims history; and (ii) migrate all programs and data libraries, including updated source code data and data files used in the production and administration of Monarch's business under the MGAA.

34.     Furthermore, Monarch noted that upon delivery of the data, FNU was also obligated to deliver FNU's software, the source and object code for the software, and all available related manuals.  Monarch explained that for purposes of the run-off, Monarch "seeks continuity of user interface and so will provide administration and direction through FNU's software systems."[14]

35.     The Notice of Termination stated that the termination of the MGAA would become effective on January 1, 2023.

**F.  Monarch's Payment Following FNU's Threat of Liquidation (Second Ransom Demand)**

36.     About a week after receiving Notice of Termination of the MGAA, the next ransom demand occurred on November 8, 2022.

37.     At 3:37 p.m. on November 8, 2022, the Debtors' counsel informed Monarch's counsel that, if the Debtors were not paid by 5:00 p.m. November 9, 2022, the already terminated MGAA would be immediately terminated for nonpayment, services to Monarch would cease immediately, and FNU would liquidate.  Needless to say, FNU's immediate termination of all services to Monarch would cause catastrophic damage to Monarch.

38.     At 10:31 a.m. the following day, counsel to the Debtors demanded $2.6 million by 5:00 p.m. that day.

39.     By 5:48 p.m. on November 9, 2022, twenty-six hours and eleven minutes after the second ransom demand, amounts had been reconciled and Monarch wired $2,335,631.51 to FNHC (for services rendered by FNU).

---

[14] *Id.* (citing MGAA, § 8.6(d)).

40.     Unlike the situational first ransom demand, caused by the Debtors' financial mismanagement, the second ransom demand was purely of FNU's making.  FNU intentionally threatened to harm Monarch to extract a payment, even though, as shown by the difference between what was originally demanded and what was finally paid, the amounts owed had not been finally reconciled and the pattern of erroneous invoicing continued.

### G.  Monarch Forced to Enter Licensed Software and Service Agreement (Third Ransom Demand)

41.     Given the critical need to secure proper and functional use of the Systems, representatives of Monarch immediately attempted to establish a transition protocol with FNU for Monarch's use and eventual migration off of the Systems licensed to Monarch pursuant to the MGAA.  However, FNU was not forthcoming with the information necessary to set up the use of the Systems and the transition of the Monarch data off of the Systems.

42.     On December 5, 2022, representatives of Monarch and FNU held a meeting to discuss access to the Systems, the delay in delivery of Monarch's data and records as required by the MGAA, and eventual migration of Monarch's data from the Systems to avoid disruption to Monarch's business.   At this meeting, FNU rebuffed Monarch's repeated requests for administrator access to the Systems solely to enable migration of Monarch's data and records. FNU began giving Monarch partial access to the data and software in mid-December 2022, but withheld crucial administrator access from Monarch to enable the beginning of migration of data and records as required by the MGAA.

43.     At the December 5, 2022 meeting, over a month after termination notice of the MGAA, it became clear that FNU could not fulfill its contractual obligation to deliver Monarch's data and records and migration off of the Systems could not be accomplished before the MGAA was set to terminate on January 1, 2023.  Monarch and FNU worked to establish the manner in

which FNU would honor the terms of the license of the Systems to Monarch after January 1, 2023. Finally, on December 29, 2022, some three days before Monarch/HPMA would be solely responsible for servicing its Policies, and faced with the threat that Monarch would be cut off from access to its data and access to the Systems and unable to serve its policyholders, Monarch and HPMA were forced to enter into the Licensed Software and Related Services Agreement with FNU (the "Licensed Software and Service Agreement"). The Licensed Software and Service Agreement specifically incorporates the requirement in the MGAA that FNU provide Monarch with a limited license[15] and data[16] and states that the agreement is based on HPMA and FNU's "desire to confirm in this Agreement the manner in which [] HPMA will use the software under the License . . . access and update the Data housed in the Systems and reimburse FNU . . ."[17]

44.    The Licensed Software and Service Agreement included yet another series of ransom demands by FNU. Monarch and HPMA agreed to the Licensed Software and Service Agreement to avoid irreparable harm to Monarch by reason of FNU's refusal to comply with the terms of the MGAA regarding transfer of data, and access to FNU's software.

45.    Despite the MGAA providing a license to the Systems "at no cost" to Monarch, under the terms of that Licensed Software and Service Agreement, Monarch was forced to pay FNU over $4 million in additional ransom payments for Monarch's access to its data in the Systems despite mounting evidence of damages from poor claims handling and an enormous decline in productivity of the FNU and ClaimCor adjusters, without a corresponding reduction in invoiced amounts. At the outset, Monarch paid $1,386,278 on December 29, 2022, when the agreement

---

[15] *See* Licensed Software and Service Agreement Third "Whereas" clause, which states: "the MGA[A] provides [Monarch] with a limited license to use certain FNU software after termination of the MGA[A] for purposes if compliance with Section 8.6 of the MGA[A] ("the License")."
[16] *See* Licensed Software and Service Agreement Fourth "Whereas" clause, which states: "the MGA[A] requires FNU to deliver Data (as defined in the MGA[A]) to [Monarch] which is housed within FNU's existing technology systems and platforms (the "Systems")."
[17] *See* Licensed Software and Service Agreement Seventh "Whereas" clause.

was executed, and an additional $2,717,413 in early January 2023 when Monarch/HPMA were provided access and permissions under the agreement.  Notably, systems administrator access for HPMA was specifically agreed to by FNU, despite prior protestations that it was impossible.

46.     In exchange for the $4 million in extracted payments under duress, the Licensed Software and Service Agreement requires FNU to provide "access to, and appropriate permissions for[] the Systems . . . to enable HPMA to perform all managing general agency services . . . with not only access but also administrative control to be granted to HPMA's designee (currently Byron Wells) on [December 29, 2022]."  The Agreement also provides that "[d]uring the Term neither administrator may terminate the access of the other administrator without the prior written consent of the other administrator."  Finally, the Agreement requires "Systems access . . . to be available 24 hours per day."

47.     With respect to any disputed invoices, the Licensed Software and Service Agreement provides that Monarch and FNU "shall use their best efforts to reconcile the remaining amount owing by [Monarch] to FNU within 30 days of this Agreement" and any "[a]mounts not yet reconciled at such time due to the auditors having not yet completed such remaining reconciliation shall be due on a weekly basis as reconciliations are completed, and in any event within 3 months."  In other words, the Agreement requires a third party review process to resolve disputed invoices, and there is nothing in the Agreement requiring immediate payment of disputed amounts or permitting termination of the term of the Agreement or access to the Systems for any disputes regarding payment.

48.     HPMA signed its own contract with Tierpoint on January 10, 2023 for a new system to house Monarch's data and utilize third-party software licenses to allow HPMA to service Monarch's Policies without the use of FNU's Systems.

### H.  Monarch Files POC Against FNU

49.    On February 21, 2023, Monarch filed a Proof of Claim against FNU ("POC") seeking over $1.625 million in damages based on: (i) FNU's breaches of various contractual obligations; (ii) FNU's breaches of its fiduciary duties and the duties of good faith and fair dealing; (iii) Monarch's entitlement to transition costs and indemnification; and (iv) Monarch's set-off rights.[18]  With regard to set-off rights, Monarch asserted that to the extent Monarch owes FNU for any services FNU has provided under any other contractual agreement, Monarch is entitled to a set-off of those charges based on Monarch's costs, expenses, and damages in Monarch's POC.[19]  Monarch's POC highlights FNU's pattern of bad faith and complete disregard for its contractual obligations, and the damage to Monarch caused by FNU and its representatives' malfeasance, mismanagement, and extortive behavior.

### I.    Monarch/HPMA Forced to Pay Following FNU's Threat to Terminate Access to the Systems (Fourth Ransom Demand)

50.    Apparently in response to Monarch's POC, FNU decided to extract more payments via more ransom demands.  On February 22, 2023, the day after Monarch filed its POC, FNU sent another ransom demand.  This demand from FNU directly compromised Monarch's set-off rights as set forth in Monarch's POC.

51.    This time (the fourth hostage crisis caused or manufactured by FNU), FNU claimed that Monarch/HPMA owed $3,021,761.59 in "unpaid balances" and demanded immediate payment within less than 48 hours.  HPMA and Monarch disputed that such amounts were owed. The "unpaid balances" identified by FNU directly implicated Monarch's set-off rights and included several charges that had never even been invoiced to HPMA, several more for which the

---

[18] *See* Monarch POC, Claim No. 211, filed February 21, 2023.
[19] *Id.* at ¶ 41.

requested support for reconciliation had not been provided, and one that was erroneously duplicative. Without providing any advance notice, and in direct violation of both the MGAA and the Licensed Software and Service Agreement, *before* FNU sent its ransom demand, FNU cut off HPMA's (Byron Wells) administrative level access to the Systems. Most alarmingly, FNU further threatened that if Monarch failed to pay FNU's demand in less than 48 hours, FNU would terminate Monarch/HPMA's access to the Systems entirely, which is required for HPMA to process and service Monarch's Policies.

52.     On February 23, 2023, HPMA and Monarch responded, emphasizing that FNU's actions raised serious malfeasance and mismanagement concerns and further evidenced FNU's repeated pattern of bad faith tactics. Monarch and HPMA reminded FNU that the threats by FNU to terminate access to the Systems would be catastrophic to Monarch's business. Monarch and HPMA pointed out that such substantial and irreparable harm to Monarch would also be directly harmful to Debtor FNHC, which owns a 30% interest in Monarch.

53.     Monarch and HPMA informed FNU that by terminating Mr. Wells' administrative access, FNU breached Section 4(a) of the Licensed Software and Related Services Agreement, which provides that "[d]uring the Term, neither administrator may terminate the access of the other administrator without the prior written consent of the other administrator." Unsurprisingly, given FNU's history of inflated and erroneous invoicing,[20] Monarch and HPMA identified many issues with the "unpaid balances" identified by FNU, including that: (i) FNU had not even sent HPMA invoices for several of the supposed "unpaid balances"; (ii) FNU double billed HPMA for Tierpoint's January bill and billed the entirety of the invoice to Monarch for systems housing Debtor and FNIC/DFS data; and (iii) several of the charges were from September 2022, which had

---

[20] In fact, FNU previously admitted that it overbilled Monarch hundreds of thousands of dollars and has been forced to withdraw those false and incorrect charges.

been fully reconciled based on a Mutual Offset Agreement the parties had entered. The Mutual Offset Agreement unambiguously provided that it was a "full reconciliation" of all amounts due under various contracts prior to September 30, 2022.

54. Furthermore, despite Monarch/HPMA's repeated requests, FNU had still failed to provide the requested justification for the inclusion of September services in the November MGAA catastrophe fees and December field fees to allow Monarch/HPMA to confirm that FNU's invoices related to those fees are accurate and consistent with prior contractual agreements. The *in terrorem* effect of FNU's actions was too much for Monarch/HPMA to risk. Monarch and HPMA had already invested months of hard work and the Hale Investors had tens of millions of dollars at risk at the whim of FNU's capricious demands. Notwithstanding the many issues identified and the fact that FNU was essentially engineering payments directly related to Monarch's set-off rights articulated in its POC, under protest, Monarch was forced to wire $2,414,891.04 to FNU and HPMA wired Tierpoint $455,942.58 the next morning (February 24, 2023) to avoid having its access to the Systems terminated and to ensure that Mr. Wells' administrative access would be restored immediately.[21] Monarch has reserved all rights regarding any payments that have been made based on FNU's flawed and inflated invoicing, Monarch's set-off rights, and FNU's ongoing malfeasance and mismanagement.

55. Given that the full ransom was not paid, on February 24, 2023, FNU pocketed the $2.4 million+ and demanded that an additional $150,927.50 payment be made by HPMA before it would reinstate Mr. Wells' administrative access and continued to threaten to cut off all access to the Systems.

---

[21] HPMA's February 24, 2023 payment to Tierpoint included $303,435.04 for FNU's January and February invoices, and then an advance payment of $152,507.54 for March.

56.     In another letter that same day, Monarch/HPMA pointed out that the $150,000 disputed amount represented a duplicative Tierpoint January charge and provided back-up data in two spreadsheets illustrating FNU's invoice backdating in violation of a prior agreement. Specifically, the spreadsheets demonstrate that FNU improperly invoiced HPMA/Monarch a total of $804,718 in October, November, and December for services that were actually provided by FNU in September 2022 and had been previously settled under the Mutual Offset Agreement. FNU's backdating of invoices for September charges that had already been fully reconciled by the Mutual Offset Agreement is yet another example of FNU's flawed invoicing practices. Furthermore, HPMA/Monarch noted that additional details had previously been requested on FNU's December field fees because June to November saw an average of 11 field fees billed each month, and then in December the number of field fees FNU billed for inexplicably skyrocketed to 450, without explanation.  HPMA/Monarch had initially requested this information on February 2, 2023, but instead of providing support and the dates the services were provided, FNU simply revised the bill *higher* by about $181,500, stating that the initial invoice used the wrong fee schedule.  Finally, Monarch/HPMA explained that they have no desire for any of the Debtors' data—but that Monarch/HPMA are entitled to *Monarch's* data.[22]

57.     Less than two hours later, FNU responded by email agreeing to reinstate HPMA's administrative access by the end of the day and stated that HPMA's access to the Systems will not be terminated.

58.     Despite FNU's assurances that Mr. Wells' administrative access would be reinstated that same day (on February 24, 2023), it was not until three days later that his access was restored, following yet *another* request from Monarch/HPMA.

---

[22] In fact, Monarch/HPMA believe that the Unsecured Creditors' Committee ("UCC") should review the Debtors' data as part of their duties.

59.     Given the pervasive pattern of ransom demands and FNU's other bad faith acts, there is a real danger that FNU will again threaten to terminate Monarch/HPMA's access to the Systems that is required to service and process Monarch's Policies.

## RESERVATION OF RIGHTS

60.     Plaintiffs file this Complaint with full reservation of rights with respect to the claims set forth in Monarch's POC, Claim No. 211, filed February 21, 2023.  The assertion of any claims pursuant to this Complaint is not intended as, and should not be deemed or construed as, a waiver of any position asserted by Monarch in its POC.

## COUNT I
## (Breach of Contract: MGAA)

61.     Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 60.

62.     In direct breach of Section 8.6 of the MGAA, FNU failed to provide the data, source codes, and "limited license" to FNU's software at no cost to Monarch.

63.     Specifically, during the run-off period after Monarch submitted its Notice of Termination of the MGAA, Section 8.6(c) of the MGAA required FNU to "immediately provide [Monarch] with a tape back-up of all programs and data libraries, including updated source code and data files, used in the production and administration of business hereunder."  In direct breach of its contractual obligations, FNU failed to provide the back-up of all programs, data libraries, source codes, and data files.

64.     Section 8.6(d) of the MGAA required FNU to provide "at no cost" to Monarch "a limited license" to "use [FNU's] software in connection with the administration and run-off of the business."  Section 8.6(d) of the MGAA also required FNU to "deliver the software, together with the source and object code for the software . . . immediately upon delivery of the Data to

19

[Monarch]." In direct breach of its contractual obligation, FNU failed to provide a free limited license to Monarch to use FNU's software and failed to deliver the software to Monarch.

65.     As a result of FNU's failure to perform under the MGAA, Plaintiffs were forced to enter into the Licensed Software and Service Agreement, which required Plaintiffs to pay for access to the data and Systems, which should have been provided by FNU for free.

66.     Plaintiffs have been injured and continue to be injured as a result of FNU's breach of the MGAA and are entitled to damages in an amount not yet determined.

**COUNT II**
**(Breach of Contract: Licensed Software and Service Agreement)**

67.     Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 60.

68.     Defendant FNU's cutting off HPMA's administrator's access to the Systems and threat to cut off access entirely are plain breaches of the Licensed Software and Service Agreement.

69.     *First*, FNU breached Section 4 of the Licensed Software and Service Agreement, which provides that "[d]uring the Term, neither administrator may terminate the access of the other administrator without the prior written consent of the other administrator." In direct violation of this provision, on February 22, 2023, FNU cut off Mr. Wells' administrative access without obtaining prior written consent from HPMA. Mr. Wells' administrative access remained cut off for a total of five (5) days, until February 27, 2023.

70.     *Second*, FNU breached Section 2 of the Licensed Software and Service Agreement, which requires that Monarch and FNU "shall use their best efforts to reconcile the remaining amount owing by [Monarch] to FNU within 30 days of this Agreement" and any "[a]mounts not yet reconciled at such time due to the auditors having not yet completed such remaining reconciliation shall be due on a weekly basis as reconciliations are completed, and in any event

within 3 months."  By its plain language, Section 2 requires a third party review process to resolve disputed invoices, and does not require immediate payment of disputed amounts or permit termination of the term of the agreement or access to the Systems for any disputes regarding payment.  Despite the auditing process regarding reconciliation of disputed invoices outlined in Section 2, FNU has made ransom demands for immediate payment based on flawed and inflated invoices without providing Plaintiffs the opportunity to review and reconcile disputed invoices.

71.     *Third*, Section 5 of the Licensed Software and Service Agreement requires "Systems access" to be "available 24 hours per day."  In addition to cutting off Plaintiffs' system administrator's access to the System without any warning and in direct violation of the Agreement, FNU also has repeatedly threatened to terminate access to the Systems in violation of Section 5.

72.     Plaintiffs have been injured and continue to be injured as a result of FNU's breach of the Licensed Software and Service Agreement and are entitled to damages in an amount not yet determined.

<u>**COUNT III**</u>
<u>**(Anticipatory Breach of Contract: Licensed Software and Service Agreement)**</u>

73.     Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 60.

74.     As set forth above, Defendant FNU has repeatedly threatened to cut off access to the Systems in violation of Section 5 of the Licensed Software and Service Agreement, which requires "Systems access" to be "available 24 hours per day."  Indeed, despite knowledge that cutting off Plaintiffs' access to the Systems would cause immediate and irreparable harm to Plaintiffs, FNU made the threat *in writing* to terminate access to the Systems on two separate occasions.  On February 22, 2023, FNU wrote a letter to Plaintiffs that stated "[p]lease be advised that if the above cure amount is not paid on or before 5:00 p.m. EST on February 24, 2023, then

all access of HPMA to the Systems shall be terminated." On February 24, 2023, FNU wrote in another letter that if certain demands were met "HPMA's access to the Systems will not be terminated as set forth in my letter dated February 22, 2023."

75.    FNU had the ability to perform under the Licensed Software and Service Agreement at the time FNU stated an intention not to perform.

76.    FNU's repeated threats to cut off Plaintiffs' access to the Systems evidence a distinct, unequivocal, and absolute intention not to perform its contractual obligations under the Licensed Software and Service Agreement.

77.    Plaintiffs have been injured and continue to be injured as a result of FNU's anticipatory breach of the Licensed Software and Service Agreement and are entitled to damages in an amount not yet determined.

78.    Further, due to FNU's prior breaches and its anticipatory breach of the Licensed Software and Service Agreement, Plaintiffs will suffer irreparable harm. FNU's breach in cutting off administrative access and complete access to Plaintiffs' data will render Plaintiff unable to service 60,000 Florida policyholders, crippling Plaintiffs' business and ability to do business in the future.

79.    As detailed in Monarch's February 21, 2023 POC against FNU, Monarch is entitled to set-off rights.[23] Specifically, Monarch asserted in its POC that to the extent Monarch owes FNU for any services FNU has provided under any other contractual agreement (including but not limited to the MGAA and the Licensed Software and Service Agreement), Monarch is entitled to a set-off of those charges based on Monarch's costs, expenses, and damages in Monarch's POC.

---

[23] *See* Monarch POC, Claim No. 211, filed February 21, 2023.

80.     The day after Monarch filed its POC, FNU claimed that Plaintiffs owed $3,021,761.59 in "unpaid balances" and demanded immediate payment within less than 48 hours. The "unpaid balances" identified by FNU directly implicated and compromised Monarch's set-off rights.  Under protest and to avoid irreparable harm to its business if administrator access to the Systems was not immediately restored and to ensure that access to the Systems would not be terminated, Monarch paid $2,414,891.04 to FNU on February 24, 2023.

81.     Therefore, as a result of FNU's breaches and anticipatory breach as alleged above, Plaintiffs are entitled to injunctive relief (1) prohibiting FNU from denying Plaintiffs' access to the data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies; (2) prohibiting Defendant from cutting off administrative access to the Systems; and (3) restoring the status quo of Plaintiffs' set-off rights by requiring FNU to either return the $2,414,891.04 ransom payment to Monarch or pay into the Court the $2,414,891.04 pending the outcome of Monarch's POC.

### COUNT IV
### (Breach of Duty of Good Faith and Fair Dealing)

82.     Plaintiffs re-allege and incorporate herein the allegations contained in paragraphs 1 through 60.

83.     As demonstrated by the above pattern of behavior, FNU has repeatedly breached its duty of good faith and fair dealing by leveraging its breaches of the parties' agreements in order to hold Monarch/HPMA hostage and extract improper payments under duress.

84.     All parties must act in good faith and with reasonable efforts to perform their contractual duties—both explicitly and fairly implied—and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.

85.     FNU failed to act in good faith by repeatedly breaching the MGAA and Licensed Software and Service Agreement.

86.     Accordingly, Plaintiffs have been injured and continue to be injured as a result of FNU's breaches of the covenant of good faith and fair dealing and are entitled to damages in an amount not yet determined.

87.     As detailed in Monarch's February 21, 2023 POC against FNU, Monarch is entitled to set-off rights.[24]  Specifically, Monarch asserted in its POC that to the extent Monarch owes FNU for any services FNU has provided under any other contractual agreement (including but not limited to the MGAA and the Licensed Software and Service Agreement), Monarch is entitled to a set-off of those charges based on Monarch's costs, expenses, and damages in Monarch's POC.

88.     The day after Monarch filed its POC, FNU claimed that Plaintiffs owed $3,021,761.59 in "unpaid balances" and demanded immediate payment within less than 48 hours. The "unpaid balances" identified by FNU directly implicated and compromised Monarch's set-off rights.  Under protest and to avoid irreparable harm to its business if administrator access to the Systems was not immediately restored and to ensure that access to the Systems would not be terminated, Monarch paid $2,414,891.04 to FNU on February 24, 2023.

89.     Further, due to FNU's ongoing breaches of the covenant of good faith and fair dealing, Plaintiffs will suffer irreparable harm.  FNU's prior and continuing threats of breach in ignoring the plain terms agreed upon and cutting off administrative access and complete access to Plaintiffs' data will render Plaintiff unable to service 60,000 Florida policyholders, crippling Plaintiffs' business and ability to do business in the future.

---

[24] *See* Monarch POC, Claim No. 211, filed February 21, 2023.

90.     As a result of FNU's breaches and anticipatory breach as alleged above, Plaintiffs are entitled to injunctive relief (1) prohibiting FNU from denying Plaintiffs' access to the data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies; (2) prohibiting Defendant from cutting off administrative access to the Systems; and (3) restoring the status quo of Plaintiffs' set-off rights by requiring FNU to either return the $2,414,891.04 ransom payment to Monarch or pay into the Court the $2,414,891.04 pending the outcome of Monarch's POC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Honorable Court enter an order:

a)  enjoining Defendant from denying Plaintiffs' access to the data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies;

b)  enjoining Defendant from cutting off administrative access to the Systems;

c)  restoring the status quo of Monarch's set-off rights, as set forth in Monarch's POC, by requiring Defendant to either (i) return the $2,414,891.04 ransom payment to Monarch; or (ii) pay into the Court the $2,414,891.04, until Monarch's set-off rights are determined by this Court;

d)  determining and awarding Plaintiffs the damages as sustained by Plaintiffs as a result of Defendant's improper actions set forth above;

e)  awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses; and

f)  granting such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: March 15, 2023

Respectfully submitted,

/s/ Harris J. Koroglu

Mark A. Nebrig (*pro hac vice* pending)
James R. Langdon (*pro hac vice* pending)
Stephen E. Gruendel (*pro hac vice* pending)
**MOORE & VAN ALLEN PLLC**
100 North Tryon Street, Suite 4700
Charlotte, NC 28202-4003
Telephone:  (704) 331-3602
Facsimile:  (704) 331-1159
E-mail: marknebrig@mvalaw.com
      jimlangdon@mvalaw.com
      stevegruendel@mvalaw.com

Harris J. Koroglu
Florida Bar No. 32597
Peter H. Levitt
Florida Bar No. 650978
**SHUTTS & BOWEN LLP**
200 South Biscayne Blvd., Suite 4100,
Miami, FL 33131
Telephone: (305) 347-7314
Facsimile:  (305) 347-7888
E-mail: hkoroglu@shutts.com
      plevitt@shutts.com

*Counsel for Plaintiffs Monarch National Insurance*
*Company & HP Managing Agency, LLC*