UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| FEDNAT HOLDING COMPANY, *et al.*,[1] | Case No.: 22-19451-PDR |
| | (Jointly Administered) |
| Debtors. | |

_____/

| | |
|---|---|
| MONARCH NATIONAL INSURANCE COMPANY and HP MANAGING AGENCY, LLC, | |
| Plaintiffs, | |
| v. | |
| FEDNAT UNDERWRITERS, INC., | Adv. Pro. No. 23-01053-PDR |
| Defendant. | |

_____/

**MONARCH NATIONAL INSURANCE COMPANY AND HP MANAGING AGENCY, LLC'S EXPEDITED MOTION FOR INJUNCTIVE RELIEF AND INCORPORATED MEMORANDUM OF LAW TO ENJOIN DEBTOR FEDNAT UNDERWRITERS, INC. FROM TERMINATING ACCESS TO SYSTEMS REQUIRED TO SERVICE MONARCH'S POLICYHOLDERS**

> **HEARING DATE REQUESTED:**
>
> Monarch and HPMA request a hearing on this Motion on March 30 or 31, 2023, or as soon thereafter as is convenient for the Court.

---

[1] The Debtors in these Chapter 11 Cases are FedNat Holding Company ("FNHC"); FedNat Underwriters, Inc. ("FNU"); ClaimCor, LLC ("ClaimCor"); Century Risk Insurance Services, Inc. ("CRIS"); and Insure-Link, Inc. The Debtors' headquarters are located at 14050 N.W. 14th Street, Suite 180, Sunrise, Florida.

Monarch National Insurance Company ("Monarch") and HP Managing Agency, LLC ("HPMA") by and through undersigned counsel and pursuant to 11 U.S.C. § 105(a), Federal Rule of Civil Procedure 65, and Federal Rule of Bankruptcy Procedure 7065, hereby file this *Expedited Motion for Injunctive Relief and Incorporated Memorandum of Law to Enjoin Debtor FedNat Underwriters, Inc. ("FNU") from Terminating Access to Systems Required to Service Monarch's Policyholders* (the "Motion"), and in support thereof states as follows:

This Motion is filed in conjunction with Monarch and HPMA's Adversary Complaint[2] and is supported by the Declarations of David Lockhart, Justin Edenfield, Steven A. Hale, II, and Mark A. Nebrig.

## INTRODUCTION

1.      Monarch is licensed to write homeowners property and casualty insurance in Florida.  FNU previously served as Monarch's managing general agent.  HPMA is Monarch's current managing general agent.  Monarch's policy and claims data is currently housed within technology systems and platforms that FNU currently controls (the "Systems").[3]  Access to the Systems is required for HPMA to process Monarch policyholder claims and is thus critical for Monarch to conduct its business.  Under its own contract, HPMA is diligently working with one of the Systems' providers, Tierpoint, LLC ("Tierpoint")[4], to create a new fully functioning system to house the critical Monarch policyholder data and plug into third-party software licenses that

---

[2] The Adversary Complaint requests additional injunctive relief to restore the status quo of Monarch's set-off rights, as set forth in Monarch's Proof of Claim, by requiring FNU to either (i) return the $2,414,891.04 ransom payment to Monarch; or (ii) pay into the Court the $2,414,891.04, until Monarch's set-off rights are determined by this Court. Due to the exigent circumstances of Monarch/HPMA's required access to its data in order to service 60,000 Florida policyholders, in this Motion, Monarch/HPMA only seek expedited consideration of their request for injunctive relief related to that access.

[3] Monarch owns its policy and claims data.

[4] Tierpoint provides and maintains the servers on which FNU hosts its data and on which Monarch's data is hosted as well as data for FNHC's insurance carrier and largest subsidiary, FedNat Insurance Company ("FNIC").

will allow HPMA to service Monarch's insurance policies (the "Policies") without the use of the Systems.

2.     On four separate occasions and as recently as February 22, 2023, FNU, in violation of applicable agreements and duties, has held Monarch/HPMA hostage by: (i) threatening to terminate and actually terminating certain managing general agent services owed by FNU to Monarch that are necessary for Monarch to conduct business; (ii) threatening to terminate HPMA and Monarch's Systems access to policy and claims data; and (iii) actually terminating the administrative control access to the Systems of HPMA's systems administrator, without warning—all for the purpose of extracting large payments from HPMA and Monarch as ransom.

3.     FNU's most recent ransom demand on February 22, 2023 included abruptly shutting off HPMA's administrative access to the Systems (breaching an express contractual obligation not to do so undertaken less than two months earlier) and threatening to terminate all of HPMA's (and thus Monarch's) access to the Systems if Monarch and HPMA did not pay over $3 million in supposed "unpaid balances" in less than 48 hours.  Monarch disputed such amounts on several grounds, including that they were subject to rights of offset on account of claims owed by FNU to Monarch as described more fully below.  Under protest, and notwithstanding FNU's historical pattern of inflated and admittedly erroneous invoicing practices, Monarch wired over $2.4 million to FNU and HPMA wired another approximately $450,000 to Tierpoint within the time frame FNU arbitrarily demanded to prevent immediate and irreparable harm to Monarch's business and its more than 60,000 policyholders.

4.     Notably, FNU's initial ransom demand of over $3 million inexplicably dropped to $2.8 million over the course of two days, demonstrating FNU's haphazard and inaccurate invoicing practices.

5.      In response, HPMA pointed out that $150,000 of the ransom demand was a duplicative Tierpoint January charge and further provided back-up data illustrating FNU's invoice backdating of over $800,000 in violation of prior agreements.  Less than two hours later, FNU agreed to reinstate HPMA's administrative access by the end of the day (which it failed to do until three days later) and withdrew its looming threat to cut off all Systems access.

6.      FNU is well aware that if HPMA's access to the Systems is terminated, Monarch will suffer immediate irreparable harm because HPMA will not be able to access or service any of the claims on Monarch's Policies or renew existing Policies.  If FNU deprives HPMA access to the Systems, the impact on Monarch's financial and business viability will be calamitous due to statutory requirements for continuous service to policyholders.  Furthermore, such termination of access to the Systems could be devastating to the *over sixty thousand* Monarch policyholders in Florida and their families, whose claims will not be timely serviced or processed.

7.      FNU's pattern of behavior illustrates its and its representatives' malfeasance and mismanagement, particularly given that Debtor FedNat Holding Company ("FNHC") currently owns a 30% interest in Monarch.  Thus, FNU's continuing acts of bad faith are increasing claims against FNU (reducing any value of FNU available to FNHC as the sole owner of FNU) and also damaging one of FNHC's largest remaining assets (the 30% interest in Monarch) and are in direct breach of the parties' agreements.

8.      Conspicuously and not coincidentally, FNU's latest hostage demand and cutoff of HPMA's administrator's access occurred *the day after* Monarch filed a Proof of Claim ("POC") in this Court seeking over $1.625 million from FNU based on FNU's breaches of various

contractual agreements and fiduciary duties, among other claims, along with substantial set-off and indemnification rights.[5]

9.      Only this Court can prevent yet another FNU-manufactured hostage crisis for Monarch and thousands of Florida policyholders.  Therefore, Monarch and HPMA request a preliminary injunction to prohibit FNU from again denying Monarch or HPMA access to its data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies.

## FACTS

### A.  The MGAA

10.      FNU began serving as the managing general agent for Monarch's Policies in 2015, providing managing general agent services including but not limited to underwriting, accounting, marketing, actuarial, and claims management.

11.      In March 2018, Monarch and FNU entered into an Amended and Restated Managing General Agency and Claims Administration Agreement (the "MGAA").[6]

12.      The MGAA had a three-year term that would renew automatically but could be terminated by either party with or without cause.  The MGAA "shall terminate" 60 days after the delivery of written notice to terminate "at the election of [Monarch] for any reason."  MGAA §§ 1.5, 8.2(e).

---

[5] *See* Monarch POC, Claim No. 211, filed February 21, 2023.
[6] Lockhart Decl. at ¶¶ 7, 8, attaching MGAA as Exhibit 1 and all Addendums to the MGAA as Exhibits 2, 3, 4, and 5.
*(continued on next page)*

13.     In the event of termination, the MGAA provided a "run-off" provision whereby Monarch could elect to "have [FNU] service the Policies" or Monarch could "manage the run-off itself". MGAA § 8.6(a).[7]

14.     The MGAA also stated that in the event of termination, FNU "shall immediately provide [Monarch] with a tape back-up of all programs and data libraries, including updated source code and data files, used in the production and administration of business hereunder." MGAA § 8.6(c). Furthermore, under the MGAA, FNU granted "at no cost to [Monarch], a limited license for [Monarch] to use [FNU's] software in connection with the administration and run-off of the business produced under the MGAA." FNU was obligated to "deliver the software, together with the source and object code for the software" immediately to Monarch. MGAA § 8.6(d).

**B.  Hale Investors Acquire Controlling Interest in Monarch**

15.     Following a series of precipitous and severe financial declines, in April 2022, FNHC's main insurance carrier and largest subsidiary, FedNat Insurance Company ("FNIC"), was downgraded by financial rating firm Demotech from an "A" (exceptional) to "S" (substantial), making it impossible for FNIC to procure reinsurance and remaining a going concern.[8] Shortly thereafter, Florida's Office of Insurance Regulation ("OIR") mandated a full restructuring plan in seven days from FNIC.[9]

---

[7] Pursuant to Section 8.6(a) of the MGAA, "the term 'run-off' shall mean confirming coverage under the Polices to claims adjusters, administering the in-force Policies and any required renewals and endorsement thereof, providing reports to the Company as elsewhere required by this Agreement, paying premium to the Company and return premium to the insureds, collecting all sums due from Agents, including return commissions, and such other activities of MGA specifically required by this Agreement."

[8] *See* Hale Decl. at ¶ 7. Reinsurers and many mortgage lenders will not accept less than an exceptional rating. An "S" rating is not recognized as acceptable by Fannie Mae and Freddie Mac, the government-sponsored purchasers of mortgages.

[9] *Id*.

*(continued on next page)*

16.     During a time of extreme financial distress after seventeen months of evaluating strategic alternatives with its advisors, FNHC sought assistance from its largest shareholder, a group of funds managed by Hale Partnership Capital Management, LLC (the "Hale Investors").[10] Namely, the Hale Investors were asked directly by the FNHC Board of Directors (the "Board") to submit a proposal for a restructuring plan to comply with Florida's OIR's requirements and timeline.[11] By the end of April 2022, a term sheet was executed whereby the Hale Investors would invest $15,000,000 into Monarch—which was at the time a wholly-owned subsidiary of FNIC.[12]

17.     Following approval by the Board, Florida's OIR, and consent from FNHC's bondholders, in the summer of 2022, in a series of two transactions, the Hale Investors became the 70% shareholders of Monarch's common stock (the "Monarch Investment"), effectively enabling FNHC to avoid liquidation and continue operations and protecting the significant investment the Hale Investors had made in FNHC common stock.[13]

18.     Insurance companies in Florida are required to operate with a managing general agent.  Thus, despite the change of control, the MGAA between FNU (which remained a wholly owned subsidiary of FNHC) and Monarch remained in full force and effect subject to some changes agreed to in the Monarch Investment, which were reflected in a matrix attached to the Cost Reimbursement Agreement (the "CRA").[14]

---

[10] Hale Decl. at ¶ 8.  The number of shares of FNHC held by the Hale Investors, collectively, was the largest holding of shares in FNHC.
[11] *Id.* at ¶ 9.
[12] *Id.* at ¶ 10.
[13] Forty percent (40%) of the Monarch common shares were purchased by FNHC in the same transaction, but ten percent (10%) was thereafter transferred by FNHC to the Hale Investors via a put option contract in place, leaving FNHC with a thirty percent (30%) stake in Monarch. *See* Hale Decl. at ¶ 11.
[14] Lockhart Decl. at ¶ 11, attaching July 1, 2022 Cost Reimbursement Agreement (the "CRA") as Exhibit 6.

*(continued on next page)*

**C.  Monarch's Notice of Default and Funding of Payroll (First Ransom Demand)**

19.     In September 2022, FNIC's attempt at a solvent run-off after its merger with Maison Insurance Company ("Maison") in August 2022 had failed, and FNU/FNHC were unable to pay its own employees, including those who were providing services for the benefit of Monarch under the MGAA.[15]  As such, to avoid the irreparable harm of FNU/FNHC losing employees essential to performance of services under the MGAA, Monarch was forced to make its first ransom payment and funded FNU/FNHC's mid-September payroll in the amount of $681,025.98 to prevent loss of service, minimize the disruption to Monarch's business, and mitigate its damages from FNU's failure to perform.[16]

20.     As a result of FNU/FNHC's inability to fund payroll, FNU was unable to provide the services required of it under the MGAA.  As such, Monarch provided a written Notice of Default and Violation of the MGAA to FNU.[17]  Among other breaches, Monarch asserted that FNU "failed to provide adequate staffing to timely provide the agreed upon services." [18]

**D.  FNU Abruptly Refuses to Provide Certain Services to Monarch**

21.     In October 2022, FNHC hired GGG Partners, LLC ("GGG") to serve as its restructuring advisor.  Shortly after GGG was hired, FNU abruptly took the position that many of the services FNU had historically provided to Monarch since its inception and had been providing to Monarch under the MGAA were somehow no longer contractual obligations of FNU.

22.     As further explained in Monarch's POC, FNU, consistent with its contractual obligations, had historically provided a suite of services including but not limited to underwriting, accounting, and marketing services to Monarch.  Now, during its obvious time of financial distress,

---

[15] On September 27, 2022, FNIC was placed in receivership by the Florida Department of Financial Services.
[16] Lockhart Decl. at ¶ 12.
[17] *Id.* at ¶ 13, attaching September 23, 2022 Notice of Default and Violation of the MGAA as Exhibit 7.
[18] *Id.* at ¶ 14, Exhibit 7.

FNU suddenly took the position that it was not required to provide such services, despite the plain language in the parties' contractual agreements to the contrary. As a result, Monarch, in order to remain in business, was forced to retain and pay third parties and hire a new managing general agent (HPMA), which had to retain and pay new employees, to provide such services.[19]

23.     Similarly, FNU ceased paying one of its long-time subcontractors that had been performing actuarial services that FNU was required to provide under the MGAA. As a result, Monarch was forced to make these payments to avoid having the actuarial services cut off.[20]

24.     Furthermore, FNU failed to retain sufficient staff and failed to manage their staff and independent contractors to adjust claims on Monarch's Policies, as required under the MGAA. Indeed, there was such a steep underperformance in the number of Monarch claims adjusted in October 2022 after Hurricane Ian that Monarch was forced to hire a third party to perform claims adjusting services in October and November 2022. Adding insult to injury, after these bankruptcy proceedings were filed in early December 2022, almost all of FNU's claims adjusters (both employed adjusters and independent contractors) either went on vacation or were otherwise simply not performing their duties, in dereliction of FNU's contractual obligations owed to Monarch. FNU's failure to adequately adjust claims has resulted in an increase in the number of Department of Financial Services ("DFS") complaints, lawsuits, and instances where claims were allegedly mishandled.[21]

### E.  Monarch Terminates The MGAA

25.     On November 1, 2022, and based on FNU's failure to cure its breaches, poor performance, and its open rejection of its contractual obligations, Monarch sent a Notification of

---

[19] *See* Monarch POC, Claim No. 211, filed February 21, 2023; Lockhart Decl. at ¶ 16.
[20] *Id*; *see also* Lockhart Decl. at ¶ 17.
[21] *Id.*; *see also* Lockhart Decl. at ¶¶ 18–20.
*(continued on next page)*

Termination of the MGAA to FNU.[22]  In its Notice of Termination, Monarch informed FNU that Monarch "intends for [FNU] to service the Policies through the sixty (60) day run-off period and to transition all necessary functions promptly pursuant to the terms of the MGA[A]."[23]

26.    In its Notice of Termination, Monarch specifically stated that FNU must honor its obligations in the MGAA to: (i) provide Monarch with FNU's records regarding Monarch's business, including all claims history; and (ii) migrate all programs and data libraries, including updated source code data and data files used in the production and administration of Monarch's business under the MGAA.[24]

27.    Furthermore, Monarch noted that upon delivery of the data, FNU was also obligated to deliver FNU's software, the source and object code for the software, and all available related manuals.  Monarch explained that for purposes of the run-off, Monarch "seeks continuity of user interface and so will provide administration and direction through FNU's software systems."[25]

28.    The Notice of Termination stated that the termination of the MGAA would become effective on January 1, 2023.[26]

**F.  Monarch's Payment Following FNU's Threat of Liquidation (Second Ransom Demand)**

29.    About a week after receiving Notice of Termination of the MGAA, the next ransom demand occurred on November 8, 2022.

30.    At 3:37 p.m. on November 8, 2022, the Debtors' counsel informed Monarch's counsel that, if the Debtors were not paid by 5:00 p.m. November 9, 2022, the already terminated

---

[22] Lockhart Decl. at ¶ 21, attaching November 1, 2022 Notice of Termination of MGAA as Exhibit 8.
[23] *Id.* at Exhibit 8.
[24] *Id.* (citing MGAA, §§ 8.5(c), 8.6(c)).
[25] *Id.* (citing MGAA, § 8.6(d)).
[26] *Id*.
*(continued on next page)*

MGAA would be immediately terminated for nonpayment, services to Monarch would cease immediately, and FNU would liquidate. Needless to say, FNU's immediate termination of all services to Monarch would cause catastrophic damage to Monarch.[27]

31.     At 10:31 a.m. the following day, counsel to the Debtors demanded $2.6 million by 5:00 p.m. that day.[28]

32.     By 5:48 p.m. on November 9, 2022, twenty-six hours and eleven minutes after the second ransom demand, amounts had been reconciled and Monarch wired $2,335,631.51 to FNHC (for services rendered by FNU).[29]

33.     Unlike the situational first ransom demand, caused by the Debtors' financial mismanagement, the second ransom demand was purely of FNU's making. FNU intentionally threatened to harm Monarch to extract a payment, even though, as shown by the difference between what was originally demanded and what was finally paid, the amounts owed had not been finally reconciled and the pattern of erroneous invoicing continued.

## G. Monarch Forced to Enter Licensed Software and Service Agreement (Third Ransom Demand)

34.     Given the critical need to secure proper and functional use of the Systems, representatives of Monarch immediately attempted to establish a transition protocol with FNU for Monarch's use and eventual migration off of the Systems licensed to Monarch pursuant to the MGAA. However, FNU was not forthcoming with the information necessary to set up the use of the Systems and the transition of the Monarch data off of the Systems.

35.     On December 5, 2022, representatives of Monarch and FNU held a meeting to discuss access to the Systems, the delay in delivery of Monarch's data and records as required by

---

[27] Nebrig Decl. at ¶ 4, attaching November 8, 2022 E-mail as Exhibit 1.
[28] *Id.* at ¶ 5, attaching November 9, 2022 E-mail as Exhibit 2.
[29] *Id.* at ¶ 6, attaching November 9, 2022 E-mail as Exhibit 3.

the MGAA, and eventual migration of Monarch's data from the Systems to avoid disruption to Monarch's business.   At this meeting, FNU rebuffed Monarch's repeated requests for administrator access to the Systems solely to enable migration of Monarch's data and records. FNU began giving Monarch partial access to the data and software in mid-December 2022, but withheld crucial administrator access from Monarch to enable the beginning of migration of data and records as required by the MGAA.[30]

36.    At the December 5, 2022 meeting, over a month after termination notice of the MGAA, it became clear that FNU could not fulfill its contractual obligation to deliver Monarch's data and records and migration off of the Systems could not be accomplished before the MGAA was set to terminate on January 1, 2023.   Monarch and FNU worked to establish the manner in which FNU would honor the terms of the license of the Systems to Monarch after January 1, 2023.[31]  Finally, on December 29, 2022, some three days before Monarch/HPMA would be solely responsible for servicing its Policies, and faced with the threat that Monarch would be cut off from access to its data and access to the Systems and unable to serve its policyholders, Monarch and HPMA were forced to enter into the Licensed Software and Related Services Agreement[32] with FNU (the "Licensed Software and Service Agreement").   The Licensed Software and Service Agreement specifically incorporates the requirement in the MGAA that FNU provide Monarch with a limited license[33] and data[34] and states that the agreement is based on HPMA and FNU's

---

[30] Lockhart Decl. at ¶¶ 25, 26.

[31] *Id.* at ¶ 26.

[32] Edenfield Decl. at ¶ 13, attaching Licensed Software and Service Agreement as Exhibit 1.

[33] *See* Edenfield Decl. Exhibit 1, Third "Whereas" clause, which states: "the MGA[A] provides [Monarch] with a limited license to use certain FNU software after termination of the MGA[A] for purposes of compliance with Section 8.6 of the MGA[A] ("the License")."

[34] *See id.* at Fourth "Whereas" clause, which states: "the MGA[A] requires FNU to deliver Data (as defined in the MGA[A]) to [Monarch] which is housed within FNU's existing technology systems and platforms (the "Systems")."
*(continued on next page)*

"desire to confirm by this Agreement the manner in which [] HPMA will use the software under the License . . . access and update the Data housed on FNU's Systems and reimburse FNU . . . ."[35]

37.    The Licensed Software and Service Agreement included yet another series of ransom demands by FNU.[36]  Monarch and HPMA agreed to the Licensed Software and Service Agreement to avoid irreparable harm to Monarch by reason of FNU's refusal to comply with the terms of the MGAA regarding transfer of data, and access to FNU's software.

38.    Despite the MGAA providing a license to the Systems "at no cost" to Monarch, under the terms of that Licensed Software and Service Agreement, Monarch was forced to pay FNU over $4 million in additional ransom payments for Monarch's access to its data in the Systems despite mounting evidence of damages from poor claims handling and an enormous decline in productivity of the FNU and ClaimCor adjusters, without a corresponding reduction in invoiced amounts.  At the outset, Monarch paid $1,386,278 on December 29, 2022, when the agreement was executed, and an additional $2,717,413 in early January 2023 when Monarch/HPMA were provided access and permissions under the agreement.[37]  Notably, systems administrator access for HPMA was specifically agreed to by FNU, despite prior protestations that it was impossible.[38]

39.    In exchange for the $4 million in extracted payments under duress, the Licensed Software and Service Agreement requires FNU to provide "access to, and appropriate permissions for[] the Systems . . . to enable HPMA to perform all managing general agency services . . . with not only access but also administrative control to be granted to HPMA's designee (currently Byron Wells) on [December 29, 2022]."[39]  The Agreement also provides that "[d]uring the Term, neither

---

[35] *See id.* at Seventh "Whereas" clause.
[36] *See id.*
[37] *See* Edenfield Decl. Exhibit 1 at § 2.
[38] *Id.* at § 4(a); Edenfield Decl. at ¶ 15.
[39] Edenfield Decl. Exhibit 1 at § 4(a).
*(continued on next page)*

administrator may terminate the access of the other administrator without the prior written consent of the other administrator."[40]  Finally, the Agreement requires "Systems access . . . to be available 24 hours per day[.]"[41]

40.    With respect to any disputed invoices, the Licensed Software and Service Agreement provides that Monarch and FNU "shall use their best efforts to reconcile the remaining amount owing by [Monarch] to FNU within 30 days of this Agreement" and any "[a]mounts not yet reconciled at such time due to the auditors having not yet completed such remaining reconciliation shall be due on a weekly basis as reconciliations are completed, and in any event within 3 months."[42]  In other words, the Agreement requires a third party review process to resolve disputed invoices, and there is nothing in the Agreement requiring immediate payment of disputed amounts or permitting termination of the term of the Agreement or access to the Systems for any disputes regarding payment.

41.    HPMA signed its own contract with Tierpoint on January 10, 2023 for a new system to house Monarch's data and utilize third-party software licenses to allow HPMA to service Monarch's Policies without the use of FNU's Systems.

### H.  Monarch Files POC Against FNU

42.    On February 21, 2023, Monarch filed a Proof of Claim against FNU ("POC") seeking over $1.625 million in damages based on: (i) FNU's breaches of various contractual obligations; (ii) FNU's breaches of its fiduciary duties and the duties of good faith and fair dealing; (iii) Monarch's entitlement to transition costs and indemnification; and (iv) Monarch's set-off

---

[40] *Id.*
[41] *Id.* at § 5.
[42] *Id.* at § 2.
*(continued on next page)*

rights.[43]  With regard to set-off rights, Monarch asserted that to the extent Monarch owes FNU for any services FNU has provided under any other contractual agreement, Monarch is entitled to a set-off of those charges based on Monarch's costs, expenses, and damages in Monarch's POC.[44] Monarch's POC highlights FNU's pattern of bad faith and complete disregard for its contractual obligations, and the damage to Monarch caused by FNU and its representatives' malfeasance, mismanagement, and extortive behavior.

## I.    Monarch/HPMA Forced to Pay Following FNU's Threat to Terminate Access to the Systems (Fourth Ransom Demand)

43.    Apparently in response to Monarch's POC, FNU decided to extract more payments via more ransom demands.  On February 22, 2023, the day after Monarch filed its POC, FNU sent another ransom demand.[45]  This demand from FNU directly compromised Monarch's set-off rights as set forth in Monarch's POC.

44.    This time (the fourth hostage crisis caused or manufactured by FNU), FNU claimed that Monarch/HPMA owed $3,021,761.59 in "unpaid balances" and demanded immediate payment within less than 48 hours.[46]  HPMA and Monarch disputed that such amounts were owed. The "unpaid balances" identified by FNU directly implicated Monarch's set-off rights and included several charges that had never even been invoiced to HPMA, several more for which the requested support for reconciliation had not been provided, and one that was erroneously duplicative.  Without providing any advance notice, and in direct violation of both the MGAA and the Licensed Software and Service Agreement, ***before*** FNU sent its ransom demand, FNU cut off

---

[43] *See* Monarch POC, Claim No. 211, filed February 21, 2023.
[44] *Id.* at ¶¶ 41-43.
[45] Nebrig Decl. at ¶ 7, attaching K. Poston February 22, 2023 Letter as Exhibit 4.
[46] Nebrig Decl. Exhibit 4.
*(continued on next page)*

HPMA's (Byron Wells) administrative level access to the Systems.[47]  Most alarmingly, FNU further threatened that if Monarch failed to pay FNU's demand in less than 48 hours, FNU would terminate Monarch/HPMA's access to the Systems entirely, which is required for HPMA to process and service Monarch's Policies.[48]

45.    On February 23, 2023, HPMA and Monarch responded, emphasizing that FNU's actions raised serious malfeasance and mismanagement concerns and further evidenced FNU's repeated pattern of bad faith tactics.[49]  Monarch and HPMA reminded FNU that the threats by FNU to terminate access to the Systems would be catastrophic to Monarch's business.[50]  Monarch and HPMA pointed out that such substantial and irreparable harm to Monarch would also be directly harmful to Debtor FNHC, which owns a 30% interest in Monarch.[51]

46.    Monarch and HPMA informed FNU that by terminating Mr. Wells' administrative access, FNU breached Section 4(a) of the Licensed Software and Related Services Agreement, which provides that "[d]uring the Term, neither administrator may terminate the access of the other administrator without the prior written consent of the other administrator."[52]  Unsurprisingly, given FNU's history of inflated and erroneous invoicing,[53] Monarch and HPMA identified many issues with the "unpaid balances" identified by FNU, including that: (i) FNU had not even sent HPMA invoices for several of the supposed "unpaid balances"; (ii) FNU double billed HPMA for Tierpoint's January bill and billed the entirety of the invoice to Monarch for systems housing Debtor and FNIC/DFS data; and (iii) several of the charges were from September 2022, which had

---

[47] *Id.*
[48] *Id.*
[49] Nebrig Decl. at ¶ 8, attaching M. Nebrig February 23, 2023 Letter as Exhibit 5.
[50] Nebrig Decl. Exhibit 5.
[51] *Id.*
[52] Edenfield Decl. Exhibit 1 at § 4(a).
[53] In fact, FNU previously admitted that it overbilled Monarch hundreds of thousands of dollars and has been forced to withdraw those false and incorrect charges.
*(continued on next page)*

been fully reconciled based on a Mutual Offset Agreement the parties had entered.  The Mutual Offset Agreement unambiguously provided that it was a "full reconciliation" of all amounts due under various contracts prior to September 30, 2022. [54]

47.    Furthermore, despite Monarch/HPMA's repeated requests, FNU had still failed to provide the requested justification for the inclusion of September services in the November MGAA catastrophe fees and December field fees to allow Monarch/HPMA to confirm that FNU's invoices related to those fees are accurate and consistent with prior contractual agreements.  The *in terrorem* effect of FNU's actions was too much for Monarch/HPMA to risk.  Monarch and HPMA had already invested months of hard work and the Hale Investors had tens of millions of dollars at risk at the whim of FNU's capricious demands.  Notwithstanding the many issues identified and the fact that FNU was essentially engineering payments directly related to Monarch's set-off rights articulated in its POC, under protest, Monarch was forced to wire $2,414,891.04 to FNU and HPMA wired Tierpoint $455,942.58 the next morning (February 24, 2023) to avoid having its access to the Systems terminated and to ensure that Mr. Wells' administrative access would be restored immediately.[55]  Monarch has reserved all rights regarding any payments that have been made based on FNU's flawed and inflated invoicing, Monarch's set-off rights, and FNU's ongoing malfeasance and mismanagement.

48.    Given that the full ransom was not paid, on February 24, 2023, FNU pocketed the $2.4 million+ and demanded that an additional $150,927.50 payment be made by HPMA before it

---

[54] *Id.*; *see also* Lockhart Decl. at ¶ 24, attaching November 9, 2022 Mutual Offset Agreement as Exhibit 9.
[55] HPMA's February 24, 2023 payment to Tierpoint included $303,435.04 for FNU's January and February invoices, and then an advance payment of $152,507.54 for March. *See* Nebrig Decl. at ¶¶ 8–9, attaching copies of the relevant wire transfers as Exhibits 6 and 7.
*(continued on next page)*

would reinstate Mr. Wells' administrative access and continued to threaten to cut off all access to the Systems.[56]

49.    In another letter that same day, Monarch/HPMA pointed out that the $150,000 disputed amount represented a duplicative Tierpoint January charge and provided back-up data in two spreadsheets illustrating FNU's invoice backdating in violation of a prior agreement.[57] Specifically, the spreadsheets demonstrate that FNU improperly invoiced HPMA/Monarch a total of $804,718 in October, November, and December for services that were actually provided by FNU in September 2022 and had been previously settled under the Mutual Offset Agreement.[58] FNU's backdating of invoices for September charges that had already been fully reconciled by the Mutual Offset Agreement is yet another example of FNU's flawed invoicing practices. Furthermore, HPMA/Monarch noted that additional details had previously been requested on FNU's December field fees because June to November saw an average of 11 field fees billed each month, and then in December the number of field fees FNU billed for inexplicably skyrocketed to 450, without explanation.  HPMA/Monarch had initially requested this information on February 2, 2023, but instead of providing support and the dates the services were provided, FNU simply revised the bill *higher* by about $181,500, stating that the initial invoice used the wrong fee schedule.[59]  Finally, Monarch/HPMA explained that they have no desire for any of the Debtors' data—but that Monarch/HPMA are entitled to *Monarch's* data.[60]

[56] Nebrig Decl. at ¶ 11, attaching K. Poston February 24, 2023 Letter as Exhibit 8.
[57] *Id.* at ¶ 13, attaching M. Nebrig February 24, 2023 Letter as Exhibit 10.
[58] *See* Lockhart Decl. Exhibit 9.
[59]  Hale Decl. at ¶ 12, attaching January 18 to February 7, 2023 Email Correspondence as Exhibit 1.
[60] Nebrig Decl. at ¶ 13, attaching M. Nebrig February 24, 2023 Letter as Exhibit 10.  In fact, Monarch/HPMA believe that the Unsecured Creditors' Committee ("UCC") should review the Debtors' data as part of their duties.
*(continued on next page)*

50.    Less than two hours later, FNU responded by email agreeing to reinstate HPMA's administrative access by the end of the day and stated that HPMA's access to the Systems will not be terminated.[61]

51.    Despite FNU's assurances that Mr. Wells' administrative access would be reinstated that same day (on February 24, 2023), it was not until three days later that his access was restored, following yet *another* request from Monarch/HPMA.[62]

52.    Given the pervasive pattern of ransom demands and FNU's other bad faith acts, there is a real danger that FNU will again threaten to terminate Monarch/HPMA's access to the Systems that is required to service and process Monarch's Policies.

## ARGUMENT

53.    Monarch/HPMA is entitled to a preliminary injunction because: (1) Monarch/HPMA are substantially likely to succeed on the merits of the claims; (2) Monarch/HPMA will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to Monarch/HPMA outweighs any damage an injunction may cause FNU; and (4) an injunction would not be adverse to the public interest, but instead would be in the public interest. *See Pine v. City if W. Palm Beach*, 762 F.3d 1262, 1268 (11th Cir. 2014) (setting out standard for Preliminary Injunction); *see also Kapila v. Clark*, 414 B.R. 849, 856 (Bankr. S.D. Fla. 2009) (citing *in re Prime Motor Inns*, 131 B.R. 233 (Bankr. S.D. Fla 1991)).

### A.  Monarch and HPMA Have a Substantial Likelihood of Success on the Merits

54.    *First*, Monarch and HPMA have a substantial likelihood of success on the merits because FNU's cutting off HPMA's administrator's access to the Systems and threat to cut off access entirely are plain breaches of both the MGAA and Licensed Software and Services

---

[61] *Id.* at ¶ 14, attaching email thread from February 23, 2023 to February 27, 2023 as Exhibit 9.
[62] *Id.* at Exhibit 9.

Agreement, further evidencing FNU is not acting in good faith.  FNU breached the MGAA by failing to provide the data, source codes, and "limited license" to FNU's software at no cost to Monarch in violation of MGAA Section 8.6.  Additionally, FNU breached the Licensed Software and Service Agreement by (i) cutting off Mr. Wells' administrative access without obtaining prior written consent in violation of Section 4; (ii) failing to follow the auditing process regarding reconciliation of disputed invoices outlined in Section 2; and (iii) threatening to terminate access to the Systems in violation of Section 5, which requires "Systems access" to be "available 24 hours per day."[63]

55.     Furthermore, as demonstrated by the above pattern of behavior, FNU has repeatedly breached its duty of good faith and fair dealing by leveraging its breaches of the parties' agreements in order to hold Monarch/HPMA hostage and extract improper payments under duress.

### B.  Monarch and HPMA Will Suffer Irreparable Harm

56.     *Second*, Monarch and HPMA, and over sixty thousand families who have insurance through Monarch, will suffer immediate and irreparable harm if FNU terminates Monarch/HPMA's access to the Systems.  Without access, Monarch/HPMA cannot service the Policies.  Furthermore, given that FNHC owns a 30% interest in Monarch, if Monarch/HPMA's access to the Systems is cut off, there will be severe financial implications to the Debtors' estate.  Bankruptcy courts have consistently found that improperly withholding or precluding access to data, and other acts of ransoming data that properly belongs to another company, causes the type of irreparable harm that injunctive relief is designed to prevent.  *See, e.g.*, *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[A]n injury is not speculative simply because it is not certain to occur.  An irreparable harm requirement is met if a plaintiff demonstrates

---

[63] Edenfield Decl. Exhibit 1.

a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." [citations omitted.]); *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (Irreparable harm found based upon evidence that it was impossible to precisely calculate the amount of damage plaintiff may suffer from loss of customers.); *Pixius Communs., L.L.C. v. Ranking* (*In re Pixius Communs., L.L.C.*), 2005 Bankr. LEXIS 2087, at *34–35 (Bankr. Kan. Oct. 13, 2005) (finding irreparable harm where the defendants' interference with the plaintiff debtor's wireless internet operations cut off the plaintiff's ability to service its internet and e-mail customers).

### C.  The Threatened Injury Outweighs Damages to FNU

57.    *Third*, the threatened injury to Monarch/HPMA and the policyholders significantly outweighs the damages to FNU.  Namely, FNU need only continue to allow Monarch/HPMA access to the data and Servers, as required by the Licensed Software and Service Agreement, whereas Monarch/HPMA could cease to function without the contracted-for access.

### D.  An Injunction Would Not Be Adverse to the Public Interest

58.    *Fourth*, an injunction would not be adverse to the public interest.  Instead, an injunction would be in the public interest because it would protect over sixty thousand Monarch policyholders and their families by ensuring that Monarch/HPMA will be able to timely serve and administer their claims.  *See Pixius Communs.*, 2005 Bankr. LEXIS 2087 at *38 (concluding that the public interest factor had been met where "the issuance of a preliminary injunction *advance[d]* the public interest and [was] not in any matter adverse") (emphasis in original).

## CONCLUSION

59.     WHEREFORE, Monarch and HPMA respectfully request this Honorable Court to enter an injunction barring FNU from denying Monarch or HPMA access to its data, software, or the Systems that are necessary for HPMA to process and service claims on Monarch's Policies.

Dated: March 15, 2023                                Respectfully submitted,

                                                     /s/ Harris J. Koroglu
Mark A. Nebrig (*pro hac vice* pending)              Harris J. Koroglu
James R. Langdon (*pro hac vice* pending)            Florida Bar No. 32597
Stephen E. Gruendel (*pro hac vice* pending)         Peter H. Levitt
**MOORE & VAN ALLEN PLLC**                           Florida Bar No. 650978
100 North Tryon Street, Suite 4700                   **SHUTTS & BOWEN LLP**
Charlotte, NC 28202-4003                             200 South Biscayne Blvd., Suite 4100,
Telephone:  (704) 331-3602                           Miami, FL 33131
Facsimile:   (704) 331-1159                          Telephone: (305) 347-7314
E-mail: marknebrig@mvalaw.com                        Facsimile:  (305) 347-7888
         jimlangdon@mvalaw.com                       E-mail: hkoroglu@shutts.com
         stevegruendel@mvalaw.com                             plevitt@shutts.com

*Counsel for Plaintiffs Monarch National Insurance*
*Company and HP Managing Agency, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2023, a true and correct copy of the foregoing was served via served via ECF on all parties receiving electronic notice in this case, and via UPS and first-class U.S. Mail, postage prepaid, to: FedNat Underwriters, Inc., 14050 NW 14th Street, Suite 180, Sunrise, FL 33323.

                                                     /s/ Harris J. Koroglu
                                                     Harris J. Koroglu